# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) | |
| MURRAY HOOPER, ) | |
| Petitioner, ) | |
| ) | Case No. 10 C 1809 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| CHARLES L. RYAN, Director of Arizona ) | |
| Department of Corrections, and LISA ) | |
| MADIGAN, Illinois Attorney General, ) | |
| ) | |
| Respondents. ) | |

## MEMORANDUM OPINION & ORDER

Murray Hooper was convicted of three counts of murder, aggravated kidnapping, and armed robbery and sentenced to death[1] following a trial before the infamous and thoroughly disgraced Judge Maloney. (Maloney would later be convicted of participating in a racketeering conspiracy, racketeering, extortion under color of official right, and obstruction of justice based on bribes he took while serving as a judge in Cook County. *See generally United States v. Maloney*, 71 F.3d 645, 649 (7th Cir. 1995).) Following multiple rounds through the state court review system, Hooper filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court, arguing three grounds for relief: (1) prosecutors violated *Batson v. Kentucky*, 476 U.S. 79 (1986), when they used peremptory strikes to eliminate all black potential jurors; (2) Hooper's due process right to a fair trial was violated because Maloney infected the proceedings with "compensatory bias" by taking a pro-prosecution bent to cover up Maloney's own criminal conduct; and (3) Hooper's due process rights were violated when Maloney allowed Hooper's

---

[1]     His sentence was converted to life imprisonment in 2003 by then-Illinois governor George Ryan.

involuntary and coerced statements to be used against him at trial. After filing his petition, but before this court had the opportunity to rule, Hooper filed a motion requesting discovery, an expansion of the record, and an evidentiary hearing. For the reasons set forth below, the court denies the petition and the request for evidentiary development, and grants Hooper a certificate of appealability as to all issues.

## I. BACKGROUND

The charges at issue stem from Hooper's indictment, along with Roger Collins and William Bracy (sometimes spelled "Bracey"), for the armed robbery, aggravated kidnapping, and murder of Frederick Lacey, R.C. Pettigrew, and Richard Holliman. According to the Illinois Supreme Court,[2] on the morning of November 13, 1980, Lacey, Pettigrew, and Holliman were found dead from gunshot wounds under a viaduct at Roosevelt Road and Clark Street in Chicago. Holliman was found in the back seat of a red Oldsmobile with his hands bound; he had received three bullet wounds to the chest and one in the back of the neck. Lacey was found lying on the ground outside the driver's side of the car. He had been shot in the back of the head. Pettigrew was lying under the front bumper with rope and cloth tied around his wrists. He had been shot in the face, chest, leg, and back.

Collins, Bracy, and Hooper were arrested and charged with the crimes. The case was initially assigned to another judge, but as the result of a motion for substitution, the case was reassigned to Judge Maloney. Bracy and Collins subsequently moved for, and

---

[2] The court takes most of its facts regarding the trial nearly verbatim from the Illinois Supreme Court's recitation in *People v. Hooper*, 552 N.E.2d 684, 686-89 (Ill. 1989). *See Morgan v. Hardy*, 662 F.3d 790, 797-98 (7th Cir. 2011) ("We presume state factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a state court of review based on the trial record.") (citations omitted). Additional uncontroverted facts from the record are included wherever helpful.

were granted, a severance from Hooper; they proceeded to trial first, were convicted, and were sentenced to death. *See Bracy v. Gramley*, 520 U.S. 899, 900-01 (1997) (so noting).

Hooper had been scheduled for trial immediately thereafter, but his case was continued until after Maloney tried what Hooper calls the "Chinatown case." In the Chinatown case, Maloney allowed three defendants who were charged with murder to remain on bond; he then directed findings of acquittal for all of them in exchange for some portion of a $100,000 bribe. *Maloney*, 71 F.3d at 650 (describing the fix). On August 14, 1981—just after the Chinatown case concluded—Maloney began to resolve the final pretrial matters in Hooper's case. On Monday, August 17, 1981, Maloney held a hearing on a motion Hooper's counsel had filed seeking to suppress Hooper's incriminating statements. Hooper claimed that he was beaten by the police and coerced into making the statements, but Maloney denied the motion after hearing testimony and argument.

Immediately following the suppression hearing, jury selection began. The prosecution and the defense each were given twenty peremptory strikes. Of the eleven peremptory strikes actually used by the prosecution, five were exercised against black veniremembers. Hooper's counsel raised the issue of racial discrimination twice with Maloney during the voir dire, but Maloney stated that there was no reason to question the State's use of peremptory challenges. Because all of the other black veniremembers had been excused for cause, Hooper—who is black—proceeded to trial without a single black person on his jury.

The Illinois Supreme Court summed up the evidence at trial as follows. Morris Nellum testified that he had been at his girlfriend's home when, at about 9:30 p.m., Roger

Collins arrived and spoke with Nellum. Nellum then went to an apartment at 2240 South State Street, where he saw Collins, Hooper, Bracy, and three other men he did not know; two of these men (later identified as Pettigrew and Holliman) were lying on a bed with their hands tied behind them. The third man (later identified as Lacey) was standing next to the bed. Collins gave Nellum the keys to a brown Cadillac, and Nellum went to the car. He was followed shortly by Collins, Bracy, Hooper, and the three victims. Collins and Hooper shoved the victims into the rear seat of a red Oldsmobile, and then got in, with Collins taking the driver's seat. Bracy went to his own car, and when the red Oldsmobile pulled away, Bracy followed. After waiting a few minutes, Nellum drove to Clark Street and Roosevelt Road. As he approached the viaduct, he saw the other two cars and heard shots. Nellum saw Bracy put a shotgun in his car and drive away with Hooper. Collins got into Nellum's car, and Nellum drove back to the parking lot at 2240 South State Street. Bracy gave Nellum $125, and Nellum then took Collins to Lake Michigan, where Collins threw two handguns—a .38-caliber Charter Arms revolver and a .357 Magnum revolver—into the lake. Nellum identified the .38-caliber revolver as the gun he had seen Bracy give to Hooper at the 2240 South State Street address in October 1980. He also identified a photograph he had taken of Collins and Hooper in October 1980; according to Nellum, the photo showed Hooper holding the same .38-caliber revolver.

Nellum further testified that on February 21, 1981, he was arrested and brought to the police station. As he sat in the interrogation room, he heard Hooper in the next room asking to talk to him. Nellum was brought to Hooper's room, where Hooper told him in the presence of officers that "Bracey had told them everything," that Hooper was

"already buried," and that Nellum should "save" himself. Nellum stated that he had reached an agreement with the State under which he would not be charged with murder or sent to prison, but would receive a three-year sentence of protective custody and have his family relocated. On cross-examination, Nellum said that he had initially denied any knowledge of the whereabouts of the weapons, but that was the only time he lied and he was not lying at trial.

Daretha Redmond testified that on the night of the murders, she was living in a first-floor apartment at 2240 South State Street. Between 10:00 p.m. and 10:30 p.m., she saw a group of men pass her living room window; the man leading the group was wearing a wide-brimmed "Mexican" hat, and two of the men appeared to have their hands tied behind their backs. A month later, she was shown over forty photographs by police officers. She said Hooper resembled one of the men in the group that had passed her window, and that Collins resembled the man that was wearing the wide-brimmed hat. She also stated that she had seen Hooper and Collins together near the building on other occasions. On cross-examination, she stated that she could not positively identify any of the men in the group, although on redirect, she again testified that the photographs she had identified "resembled" men she had seen that night.

Detective David O'Callaghan testified that a month after the murders he showed photographs to Daretha Redmond, and later recovered evidence from 2240 South State Street. Sergeant Michael Hoke testified that he arrested William Bracy shortly before midnight on February 20, 1981. Bracy gave him a telephone number where he said Hooper could be reached. The number was registered to an apartment at 1354 North Sedgwick in Chicago. Hoke and other officers went to the apartment, but Hooper was

not there.  However, they saw a telephone number on the wall that they speculated might be Hooper's.  They traced the number to a building at 1848 North Winnebago, where they were joined by Detective O'Callaghan.  O'Callaghan then went to a public phone on the street and dialed the number.  Hooper answered and identified himself.  Officers at the building were able to hear the phone ringing in the apartment on the first floor.  O'Callaghan returned and knocked on the door of that apartment, announcing that it was the police.  Hooper opened the door and said, "You got me now.  Be cool.  Be cool."  He unlocked a burglar gate, and the police entered and told him that he was under arrest.  He was wearing only undershorts and was told to get dressed.  He said, "My clothes are in the back and there are some guns back there."  The officers recovered a .32-caliber revolver and a shotgun from the room.

Hooper was handcuffed and taken to a squad car, where his *Miranda* rights were read to him.  He indicated his understanding, and said, "You got me now.  I am going to tell you everything."  He asked who else the police had in custody, and O'Callaghan told him that they had Bracy.  Hooper became angry, stating "I know that's how you found me.  Bracey freaked on me.  He told you where I was at."  When asked if he was referring to the murders under the viaduct, Hooper said, "I know what you are talking about."  He directed the police to a building at 22nd and State, where Nellum was taken into custody.  Both Nellum and Hooper were brought to the station, where they were placed in separate interrogation rooms.

Again Hooper was read his *Miranda* rights, and again he said that he would tell them "everything."  He told the police that he went to 2240 South State and saw Collins, Bracy, Nellum, and Lacey there, along with two men he did not know whose hands were

bound.  Hooper told O'Callaghan that it was supposed to be a "rip-off" and he wanted a "piece of the action."  He said that he learned from Collins that the victims had come to buy narcotics, but it was decided that they would be robbed.  Hooper said that they left the apartment and he and Nellum drove to the viaduct in the brown Cadillac, while Collins and Bracy drove in the red Oldsmobile with the three victims.  According to Hooper, Nellum and Collins had .38-caliber revolvers and Bracy had a shotgun.  Hooper first said that he remained in the car when Collins, Bracy, and Nellum began shooting, but when questioned, he said that he shot "the guy by the right front wheel," apparently R.C. Pettigrew, with a .32-caliber pistol.  At this point O'Callaghan left the room to talk to Nellum.  Hooper asked to speak with Nellum, and O'Callaghan brought Nellum to see Hooper.  O'Callaghan corroborated Nellum's testimony that Hooper told Nellum "I am buried . . . save yourself.  You tell them everything."  After he spoke to Nellum, O'Callaghan told Hooper that there was no evidence that a .32-caliber pistol was used.  Hooper then admitted that he was given a .38-caliber revolver by Collins, and that he "shot into the back seat of the car at the guy in the back," presumably Holliman.

That morning, Lawrence Hyman, an Assistant State's Attorney, spoke with Hooper at the station.  Hooper related essentially the same story to Hyman as he had to O'Callaghan, except that he said that he and Bracy drove in the Cadillac, and that Collins, Nellum and the victims drove in another car.  Hooper added that Bracy fired the shotgun at the victims and that he was given a gun by Collins with which he shot the victim in the back seat of the car.

Firearms expert Burt Nielson of the Chicago Police Department testified regarding his examination of the weapons recovered from Lake Michigan and the bullets

and bullet fragments taken from the victims. He said that the .38-caliber Charter Arms revolver would mark a shell with eight lands and grooves, inclined to the right, and that the .357 Magnum revolver would mark a bullet with five lands and grooves, inclined to the right. All of the bullets and bullet fragments recovered from the victims exhibited one of these two class characteristics. Bullets with the class characteristics of the .38-caliber revolver were recovered from Holliman and Pettigrew, but because of the rusty condition of the recovered weapons, Nielson could not say with certainty that the bullets taken from the victims had been fired from the weapons recovered from the lake.

Hooper testified his own defense. He stated that at 5:30 a.m. on February 21, 1981, he was at 1848 North Winnebago when the police knocked on the door and said they had a warrant for his arrest. He opened the door and let the officers in, but he denied telling them of the guns in the bedroom. (In fact, he denied any knowledge of the weapons.) Hooper said that once he was in the squad car, he was beaten by Officers O'Callaghan and Hoke. He was then taken to a viaduct where he was taken from the car, knocked down, and questioned with a shotgun to his head. Hooper's right leg was twisted, causing sharp pain. He was then returned to the car, and he asked to be taken to a hospital but no one heeded his request. The officers told him they "wanted" Roger Collins, and that if Hooper cared anything about himself or his family he had better cooperate. The officers took him to the parking lot at 2240 South State Street, stayed there for ten minutes, and then brought him to the police station. Hooper stated that at the station, he had requested an attorney and medical attention but the requests were denied. He further testified that the statement he gave to the Assistant State's Attorney was what O'Callaghan had told him to say.

When cross-examined, Hooper said that he had known Collins for twenty years and had met Bracy while at Stateville penitentiary about a year before. He said that Officer Hoke had hit him in the forehead upon his arrest, but admitted that a photograph taken at the time showed no bruise or mark. He denied telling Harry Robertson, a physician's assistant at the Cook County jail, that the wound on his leg was received three or four days before his arrest, although he admitted that he did not complain to the Assistant State's Attorney of being mistreated by the police. Finally, Hooper said that he did not recall where he was on the night of the murders.

Dr. Anita Shorter testified for the defense that on February 23, 1981, she treated Hooper for an infected cut on his right ankle. On cross-examination, she stated that the wound might have been on the left leg, and that the injury could have been received anywhere from two to three days to a week before.

Harry Robertson, the physician's assistant, was called as a rebuttal witness for the State. He identified his report of February 23, 1981, in which he stated that Hooper told him that the leg wound was sustained about a week earlier. Robertson's report also noted that the wound was on Hooper's left leg. Robertson testified that if Hooper had told him that the injury was inflicted by the police, he would have included that in his report.

Following the trial, Hooper was found guilty of each offense. After a hearing on the imposition of the death penalty for the murder convictions, the jury found that there were no mitigating factors sufficient to preclude a sentence of death. Maloney then sentenced Hooper to death, and further sentenced Hooper to concurrent terms of sixty years for each of three counts of armed robbery and sixty years for each of three counts

of aggravated kidnapping. The death sentence was stayed pending direct appeal to the Illinois Supreme Court under Illinois Supreme Court Rule 603.

While Hooper's direct appeal was pending, the United States Supreme Court issued its opinion in *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson*, of course, made it clear that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection" under the Fourteenth Amendment, *id.* at 86, and set out a three-step burden-shifting framework for courts to use in determining whether a defendant has established a prosecutor's discrimination. In light of *Batson*, the Illinois Supreme Court retained jurisdiction over Hooper's appeal, but remanded the case so that Maloney could conduct a *Batson* hearing. *See People v. Hooper*, 506 N.E.2d 1305 (Ill. 1987). Hooper asked the Illinois Supreme Court to remand to a different judge, arguing that Maloney was unfairly biased against him. (These allegations had nothing to do with Maloney's alleged "compensatory bias"—indeed, at the time Maloney had yet to be indicted.) The Illinois Supreme Court rejected the request. On remand, Maloney ruled that the totality of the evidence did not raise an inference that the State used its peremptory challenges to discriminate on the basis of race, and that Hooper had not established a *prima facie* case of purposeful discrimination. The parties then filed supplemental briefs to the Illinois Supreme Court addressing Maloney's ruling.

In its opinion, the Illinois Supreme Court affirmed-in-part, vacated-in-part, and remanded the case with instructions. *See Hooper*, 552 N.E.2d at 689-703. In particular, the court held that Maloney did not abuse his discretion in denying Hooper's motion to suppress his statements, and that various of the prosecutor's arguably inflammatory statements during closing arguments at the guilt phase of trial were harmless or were

made in response to the defense's arguments. The court also found that Maloney did not improperly bolster Nellum's credibility by asking questions of Nellum during the trial.

However, the court did modify Hooper's sentence. First, it held that Hooper was improperly sentenced to three concurrent terms of sixty years on the aggravated kidnapping counts; as the kidnapping was not "for ransom," it was a Class 1 felony that carried a maximum sentence of fifteen years. The court reduced Hooper's sentence accordingly. The court also found that the prosecutor's misconduct during the death penalty phase warranted a new sentencing hearing. The prosecutor had told the jury that if they did not impose the death penalty, they would have "lied to the judge and to God"; in addition, the prosecutor raised a question as to whether Hooper would commit further murders in prison, and placed responsibility for any such acts on the jury. *See id.* at 697. In light of these remarks, the Illinois Supreme Court vacated the death sentence. Finally, the court addressed the *Batson* issue. The court found no basis for allegations of Maloney's bias, and concluded that Maloney's determination that Hooper failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence.

The case was remanded for a new sentencing hearing on the murder convictions. Much had changed since Hooper's last sentencing hearing: Hooper had been convicted of two murders and an attempted murder in Phoenix, Arizona, and Maloney had been indicted for racketeering and extortion. Hooper's second hearing took place before Judge Mannion. The jury again found Hooper to be eligible for the death penalty without any mitigating factors, and Judge Mannion sentenced Hooper to death on July 16, 1993. On

direct appeal, the Illinois Supreme Court affirmed. *See People v. Hooper*, 665 N.E.2d 1190, 1199 (Ill. 1996).

On December 21, 1995—about a month before the Illinois Supreme Court's opinion issued—Hooper filed a *pro se* post-conviction petition. The Illinois Supreme Court appointed counsel for Hooper in mid-1996, and the State filed a motion to dismiss in 1998. Hooper's counsel alerted the trial court to the fact that Hooper wished to file an amended petition, and requested an extension of time in which to do so. When the parties appeared before the trial court, however, the court denied the extension and dismissed the petition without permitting Hooper leave to amend. Hooper appealed, and on October 26, 1999, the Illinois Supreme Court remanded the case back to Judge Mannion in light of its opinion in *People v. Bounds*, 694 N.E.2d 560 (Ill. 1998), in which it held that a court violates a defendant's right to due process under the Illinois Constitution when it dismisses a petition at a hearing that the parties believe is merely a status call.

On remand, Hooper moved for discovery to support his post-conviction petition. Hooper also filed an amended petition for post-conviction relief, noting that he intended to supplement the petition with additional information uncovered in discovery. The State objected to the discovery requests, and Judge Mannion denied the discovery motion. Hooper's counsel then moved to substitute judges, arguing that Judge Mannion was prejudiced against him. The request was denied. When the case returned to Judge Mannion for a hearing on the motion to dismiss, Hooper attempted to amend the petition, but Judge Mannion denied leave to do so and granted the State's motion, dismissing the petition on June 15, 2004. Hooper appealed, requesting that the case be summarily remanded to a new judge at the trial court. On November 22, 2004, the Illinois Appellate

Court granted that motion, and the case was remanded to a new judge for a third (and final) set of post-conviction proceedings.

The court now takes a detour from Hooper's story, because by this point, Hooper's one-time codefendants, Collins and Bracy, had made their way through various appeals and post-conviction proceedings, and had filed petitions for habeas corpus. These two raised the same compensatory bias due process claim that Hooper would raise, and they requested discovery to support their claim. The district court denied the discovery request, *see U.S. ex rel. Collins v. Welborn*, 868 F. Supp. 950, 991 (N.D. Ill. 1994), and while the Seventh Circuit agreed with that decision, *see Bracy v. Gramley*, 81 F.3d 684, 691 (7th Cir. 1996), the Supreme Court did not, *see Bracy v. Gramley* ("*Gramley*"), 520 U.S. 899, 908-09 (1997). In determining that Bracy had established "good cause" for discovery,[3] the Court took care to emphasize that Bracy supported his discovery request with specific evidence of Maloney's "actual[ ] bias *in petitioner's own case*," namely allegations that his trial attorney, an associate of Maloney's, agreed to take case to trial quickly so Bracy's conviction would deflect any suspicion that the Chinatown fix would otherwise attract. *Gramley*, 520 U.S. at 908-09.

On remand, Bracy and Collins eventually made their way back up to the Seventh Circuit. Sitting *en banc*, the court recognized that Maloney was not entitled to the presumption that he had properly discharged his official duties, but that Maloney's corruption did not warrant a *per se* finding that every case over which he presided was infected. As to the rest, the court recognized that it frankly continued to struggle with

---

[3]     As Collins and Bracy filed their petitions for habeas corpus prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996, their discovery request was not governed by § 2254(d) and (e). *See Lindh v. Murphy*, 521 U.S. 320 (1997) (holding that the Antiterrorism and Effective Death Penalty Act does not apply to petitions filed prior to its enactment).

"[e]xactly what Bracy and Collins must prove to prevail on this claim." *Bracy v. Schomig* ("*Schomig*"), 286 F.3d 406, 409-10 (7th Cir. 2002). The majority interpreted the Supreme Court's opinion as requiring actual bias, which it felt was a "surprising" limitation given that the appearance of bias typically sufficed. *Id.* at 411. However, the court did not require the petitioners to find a "smoking gun" to establish their claims; instead, the court looked to draw reasonable inferences from any evidence the petitioners might present. With regard to the guilt phase of trial, the court concluded that Maloney's discretionary rulings did not lead to an inference of actual bias, as they were the type of rulings one might see in any case. As to the sentencing phase, however, the court reached the opposite conclusion. It held that Maloney's "egregious" failure to keep the proceeding fair supported the inference of compensatory bias, and this inference was a "more compelling explanation for Maloney's actions than things like incompetence, negligence, happenstance, or accident." As a result, the Seventh Circuit vacated Bracy's and Collins' death sentences. Before they could be re-sentenced, Governor George Ryan commuted their sentences to life imprisonment. *See People v. Collins*, 815 N.E.2d 860, 863 (Ill. App. Ct. 2004).

Returning now to Hooper, on remand from the Illinois Appellate Court his post-conviction petition was assigned to Judge Fox. Hooper filed an amended petition, now entitled a "Superseding Amended Petition for Post-Conviction Relief," on May 15, 2006. Because Hooper's death sentence had been commuted to life imprisonment on January 10, 2003, no claims relating to Hooper's sentence were raised. Still, this superseding petition included eleven separate claims for relief. On March 22, 2007, Judge Fox rejected those claims. In short, Judge Fox concluded that there was no evidence that

Maloney had engaged in compensatory bias during the 1981 trial or the *Batson* hearing, and that in any event the issues were either waived or *res judicata* based on Hooper's direct appeal. Judge Fox also addressed arguments based on, *inter alia*, alleged ineffective assistance of trial counsel and *Brady* violations, but rejected each claim in turn.

Hooper appealed to the Illinois Appellate Court, raising just two issues: Maloney's bias (both compensatory and racial) during the *Batson* hearing, and the voluntariness of Hooper's statements in light of new evidence that he was arrested by officers "associated with" Jon Burge, another one of the disgraced figures that dot the landscape of Illinois legal history.[4] On May 26, 2009, the appellate court affirmed Judge Fox's decision. The court concluded that Hooper failed to establish actual bias or a "nexus" between Maloney's corruption in other cases and Maloney's conduct at the *Batson* hearing. As to Hooper's claim that he should have been granted an evidentiary hearing to present "new evidence" that the police officers beat and coerced him to obtain his statements, the appellate court held that this issue had been addressed on direct appeal and was barred by the doctrine of *res judicata*. Moreover, the court held that the new evidence was irrelevant and would not have changed the result of Hooper's trial. Hooper filed a motion requesting a supervisory order in the Illinois Supreme Court, and subsequently filed a petition for leave to appeal. The Illinois Supreme Court denied the motion on October 21, 2009, and a little more than a month later, it denied leave to appeal.

---

[4] Burge is widely believed to have sanctioned and participated in the abuse of arrestees during his time as a police commander in order to obtain confessions; in June 2010, he was convicted of obstructing justice and perjuring himself in a civil rights case brought by an alleged victim. *See United States v. Burge*, No. 08 CR 846, 2011 WL 13471 (N.D. Ill. Jan. 3, 2011).

Hooper then filed a *pro se* petition for a writ of habeas corpus with this court on March 22, 2010. With the approval of the Chief Judges of the Seventh and Ninth Circuits, this court appointed counsel from the Federal Public Defender for the District of Arizona, where Hooper is presently incarcerated on death row for the Phoenix murders. Hooper filed his amended petition in September 2010. Before this court had the opportunity to rule, however, Hooper filed a motion for discovery, an evidentiary hearing, and expansion of the record. Both the petition and the request for evidentiary development are addressed herein.

## II. Legal Standard

As the Supreme Court has repeatedly emphasized, "a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (quoting *Wilson v. Corcoran*, 131 S.Ct. 13, 15 (2010)); *see Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), further narrows a reviewing court's inquiry. Under AEDPA, once a petitioner's claim is "adjudicated on the merits in State court proceedings," a federal court can grant relief only where the challenged state court decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254(d)(1), or where the state court based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. § 2254(d)(2). *See Greene v. Fisher*, 132 S.Ct. 38, 42 (2011); *Cheeks v. Gaetz*, 571 F.3d 680, 684-85 (7th Cir. 2009).

Under § 2254(d)(1), a state court's decision is contrary to clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law where the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. Under the "unreasonable application" theory, the facts in the case under review not need be identical to the facts of the case that announced a legal principle: "'Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.'" *Winston v. Boatwright*, 649 F.3d 618, 625 (7th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). Still, the state court's application of Supreme Court precedent must be more than incorrect or erroneous, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 65 (2003).

Under § 2254(d)(2), a challenge to the state court's factual determinations "will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008). Section 2254(e)(1) establishes that factual findings based on the trial record—whether made by the state trial court or by the state court of review—are presumed correct unless the petitioner rebuts that presumption by clear and convincing evidence. *Ben-Yisrayl*, 540 F.3d at 546. Where the state court's decision "rests upon a determination of fact that lies against the clear weight of the evidence, however, that

decision is by definition, a decision so inadequately supported by the record as to be . . . objectively unreasonable." *Id.* at 549 (quoting *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) (internal quotation marks omitted)).

Before a federal court may evaluate the merits of a habeas corpus petition, the petitioner must have exhausted his remedies before the state court. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (citing 28 U.S.C. § 2254(b)). This means that a defendant "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (describing Illinois' appellate procedures).

In addition, "'[a] habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim.'" *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)). Federal review also is precluded when the state court's decision rests on an adequate and independent state law ground, *see Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010), because where an independent state ground supports the judgment, a ruling on the federal claims would be advisory. *See Harrington*, 131 S.Ct. at 787; *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009) ("[W]hen a state refuses to adjudicate a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that will normally qualify as an independent and adequate state ground for denying federal review.") (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Procedurally defaulted claims will be evaluated, however, "if the petitioner can establish cause and prejudice for the default, or establish that the failure to consider the defaulted claim will result in a fundamental miscarriage of justice." *Promotor*, 628 F.3d at 885 (citing *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010)). For claims that were not presented to the state court (and therefore did not receive an adjudication on the merits), a reviewing court may "dispose of the matter as law and justice require." *See* 28 U.S.C. § 2243; *Cheeks*, 571 F.3d at 684-85.

### III. ANALYSIS

In Hooper's petition, he raises three overarching issues for this court's review. First, he raises the *Batson* challenge. Second, he brings a due process claim, arguing that he was denied a fair and impartial arbiter by virtue of Maloney's compensatory and racial bias. Finally, Hooper argues that his due process rights were violated by the use of his involuntary, coerced statements at trial. For all of these reasons, Hooper argues that this court should vacate his conviction and grant him a new trial; in the alternative, he asks the court to permit further evidentiary development pursuant to Rule 6 (discovery), Rule 7 (expansion of the record), and Rule 8 (evidentiary hearing) of the Rules Governing Section 2254 Cases in the United States District Courts. Despite the fact that Hooper was convicted more than thirty years ago, the State agrees that his habeas petition is timely, that Hooper has exhausted all of his state court remedies, and that none of Hooper's claims are barred by nonretroactivity. The court therefore addresses each issue in turn, starting with Hooper's request for evidentiary development.

**A. Request for an Evidentiary Hearing, Discovery, or Expansion of the Record**

Prior to the enactment of AEDPA, a habeas petitioner was entitled to a federal evidentiary hearing where "(1) [he alleged] facts which, if proved, would entitle him to relief and (2) the state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing." *Richardson v. Briley*, 401 F.3d 794, 800 (7th Cir. 2005). That changed with AEDPA, which "severely circumscribed" the federal court's ability to hold such a hearing. *Boyko v. Parke*, 259 F.3d 781, 789-90 (7th Cir. 2001). Now, this court "shall not" hold an evidentiary hearing unless Hooper shows that

> **(A)** the claim relies on—
>
> > **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2); *see also Holman v. Gilmore*, 126 F.3d 876, 880 (7th Cir. 1997) (noting that AEDPA applies to habeas petitions filed after enactment).

The Supreme Court recently addressed the availability of an evidentiary hearing under § 2254(d)(1) of AEDPA in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). There, it held that evidence introduced for the first time in federal court is irrelevant to, and can have no bearing on, the court's analysis of whether a state court decision is "contrary to" or "an unreasonable application of" clearly established federal law. *See Cullen*, 131 S.Ct. at 1400. In other words, "[i]f a claim has been adjudicated on the merits by a state court,

a federal habeas petitioner must overcome the limitation of § 2254(d)(1) *on the record that was before that state court*." *Id.* (emphasis added); *see Bland v. Hardy*, 672 F.3d 445 (7th Cir. 2012) (same). The Seventh Circuit has indicated that evidentiary hearings for claims under § 2254(d)(2) (*i.e.*, where the petitioner alleges that the state court based its decision "on an unreasonable determination of the facts") are circumscribed in much the same way. *See Price v. Thurmer*, 637 F.3d 831, 837 (7th Cir. 2011) (noting that § 2254(d)(2)'s statutory language "appears to leave little or no room for an evidentiary hearing in the district court").

Here, at least two of Hooper's claims—the *Batson* challenge and the judicial bias due process claim—are rooted in § 2254(d)(1) or (d)(2). Thus, under *Cullen*, Hooper has to overcome the limitations of § 2254(d) based on the state-court record; only after he does so will the court decide whether an evidentiary hearing is warranted. By contrast, Hooper argues that § 2254(d) is "inapplicable" to his police coercion claim because the constitutional issue was never decided on the merits. Assuming *arguendo* that this is true, § 2254(e)(2) would "continue[ ] to have force," and the court would look to that section to determine whether Hooper is entitled to an evidentiary hearing. *See Cullen*, 131 S.Ct. at 1401; *id.* at 1412 (Breyer, J., concurring and dissenting in part) ("If the federal habeas court finds that . . . [§ 2254](d) does not apply[ ], then an (e) hearing may be needed.").

The court must address one final point: Hooper argues throughout his motion that since he is requesting discovery and expansion of the record in *addition* to an evidentiary hearing, "the standards governing evidentiary hearings do not apply." (Pet'r Mot. for Disc. at 4, 9.) In light of *Cullen*, this court disagrees. Although *Cullen* dealt specifically

with evidentiary hearings, it did so in the context of determining what evidence a federal court could evaluate when looking at claims under § 2254(d)(1). The Court emphasized time and time again that until a petitioner "overcome[s] the limitation of § 2254(d)(1)," habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 at 1398, 1400. In this court's view, it defies logic to preclude a petitioner from developing factual information in an evidentiary hearing, but to allow the petitioner to introduce the very same factual information via discovery and expansion of the record. *See also U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 233 (7th Cir. 2003) (applying limits to evidentiary hearings under § 2254(e)(2) to "any means used in lieu of such a hearing to expand the record in order to introduce new factual information"). A number of the circuit courts that have addressed this issue agree. *See Kemp v. Ryan*, 638 F.3d 1245, 1258 & n.8 (9th Cir. 2011) (post-*Cullen*, reasoning that if AEDPA barred a petitioner from having an evidentiary hearing, the petitioner necessarily could not show "good cause" for discovery under Rule 6); *Frazier v. Bouchard*, 661 F.3d 519, 527-28 (11th Cir. 2011) (citing *Cullen* in declining to consider the expanded record received by the district court under Rule 7, and instead limiting review to the record developed by the state courts). *Cf. Donald v. Spencer*, 656 F.3d 14, 16 n.3 (1st Cir. 2011) ("Because we resolve this appeal under Rule 6, we need not address the implications of *Cullen v. Pinholster*."). As a result, unless Hooper's claims first pass muster under § 2254(d), this court will not consider allowing him to expand the record or take additional discovery.[5]

---

[5] For much the same reason, this court does not consider any evidence that Hooper seeks to introduce for the first time in his habeas petition; only evidence that was part of the state court record will be considered at this time.

**B. The Judicial Bias Due Process Claim**

The court now turns to Hooper's judicial bias claim, because this issue weaves its way through every other point raised by Hooper in his petition.  Hooper argues that his fundamental right to due process was violated by virtue of the fact that Maloney—who Hooper calls the "antithesis of a neutral arbiter"—presided over his pre-trial suppression hearing, trial, and *Batson* hearing.  The State responds that much of the claim is procedurally defaulted: Hooper failed to raise any issue relating to Maloney's bias at trial with the Illinois Appellate Court in his post-conviction proceedings, and therefore Hooper is limited to arguing bias at the pre-trial suppression and *Batson* hearings.  On the merits, the State agrees that Maloney is not entitled to a presumption that he properly discharged his official duties, but argues that the claim must fail because Hooper cannot establish that Maloney was actually biased in Hooper's own case.

**1. Procedural Default**

Turning first to the procedural default issue, Hooper raised the due process claim in his post-conviction petition before Judge Fox, arguing that Maloney was guilty of compensatory bias during "all stages of the proceedings" and that this violated his due process rights under both the U.S. and the Illinois Constitutions.  In discussing the *Batson* hearing, Hooper also alleged that Maloney was "unduly race conscious" and favored racial segregation, making any deference to his *Batson* findings inappropriate.  Judge Fox rejected those claims.  On appeal, however, Hooper raised just two issues: Maloney's judicial bias (both compensatory and racial) at the *Batson* hearing, and Maloney's compensatory bias at the suppression hearing (along with "new evidence" relating to police brutality).

The question becomes whether Hooper "fairly presented" his allegations of judicial bias *at trial* to the Illinois Appellate Court. Of course, "[a] 'hypertechnical congruence' of the claims is not required between federal and state court for a claim to be fairly presented; instead [the federal court looks to] whether the petitioner alerted the state court to the federal nature of his claim in a manner sufficient to allow that court to address the issue on a federal basis." *Crockett v. Hulick*, 542 F.3d 1183, 1192-93 (7th Cir. 2008) (internal quotation marks and citations omitted). The court analyzes four factors to determine whether an issue was fairly presented: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (internal quotation marks and citation omitted).

Hooper admits that he used "different wording" before the Illinois Appellate Court, but argues that he still fairly presented his claim of judicial bias at trial. This court disagrees. Hooper was represented by counsel both before Judge Fox and during his post-conviction appeal. While Hooper raised a due process claim on appeal by alleging bias, he chose to specifically focus on the pre-trial suppression hearing and the *Batson* proceedings; he did not direct any arguments to Maloney's alleged bias at trial, even though Hooper mentioned in his appellate brief that this was one of the issues Judge Fox addressed. In fact, Hooper did not mention any discretionary ruling made by Maloney at trial in his appellate briefs. While the general background facts relating to Maloney's

corruption were presented, Hooper did not set out facts relating to the trial that would even enable the state courts of review to evaluate that claim. Particularly in light of the fact that Judge Fox emphasized Hooper's need to establish actual bias, Hooper's briefing—both to the appellate court and in his PLA—undermines his claim to have fairly presented the issue of judicial bias at trial to the appellate court. The court finds that this particular issue is procedurally defaulted, and will limit its analysis to the pre-trial suppression and *Batson* hearings.[6]

### 2. Habeas Relief

The court now turns to the merits of Hooper's due process claim. The relevant decision is that of the Illinois Appellate Court. *See Morgan*, 662 F.3d at 797 ("The relevant decision for purposes of our assessment under AEDPA is the decision of the last state court to rule on the merits of the petitioner's claim."); *Simms v. Acevedo*, 595 F.3d 774, 780 (7th Cir. 2010) ("'Denials of petitions for leave to appeal are not decisions on the merits.'") (quoting *In re Leona W.*, 888 N.E.2d 72, 81 (Ill. 2008)).

In its opinion, the appellate court began by setting out the legal standard: Hooper had to establish "(1) a 'nexus' between the judge's corruption or criminal conduct in other cases and the judge's conduct at petitioner's trial; and (2) actual bias resulting from the judge's extrajudicial conduct." The court first examined the *Batson* hearing, and analyzed several of Hooper's proffered reasons for inferring bias: Maloney's

---

[6]     Frankly, the court finds this to be a distinction of little import. Although the Seventh Circuit has struggled to define precisely "what the petitioners' evidentiary burden is and how they can meet it" in a case like this, *see Schomig*, 286 F.3d at 410, direct evidence is not required. A petitioner does not need a "smoking gun," and "may rely on circumstantial evidence." *Franklin v. McCaughtry*, 398 F.3d 955, 960 (7th Cir. 2005) (citations omitted). So even though Hooper is precluded from arguing "actual bias" at his trial, he may still point to evidence of bias at trial to the extent that such evidence supports his claim of actual bias at other stages. For example, if Maloney made comments at trial that indicated he was biased during the suppression hearing, this evidence would be relevant to the court's present inquiry (assuming, of course, that that evidence was of record before the state courts, *see supra* note 5).

discretionary ruling that resulted in exclusion of evidence at the hearing, Maloney's finding that Hooper had not made out a *prima facie* case of discrimination, and Maloney's acceptance of the race-neutral explanations offered by prosecutors. After analyzing these issues, the appellate court concluded that Maloney's findings and behavior at the *Batson* hearing were not evidence of bias and that Hooper had not established a nexus to his particular case.

The court reached the same conclusion with respect to allegations of Maloney's alleged racial bias. Hooper pointed to, *inter alia*, Maloney's purported history of permitting race-based jury selection, certain private writings in which Maloney expressed concerns that his children would be bussed through black neighborhoods or would ride the bus with black students, and statements Maloney made at the *Batson* hearing which indicated that he had issues with the *Batson* decision and did not believe that discrimination had taken place in his courtroom. The appellate court held that Hooper had not established a nexus between Maloney's purported racial intolerance and his particular case, and that Maloney's statements at the hearing did not indicate that he was biased against Hooper.

Finally, the court touched upon the issue in the context of the police coercion claim. Hooper argued that the closeness in time of his pre-trial suppression hearing to the Chinatown case, in conjunction with Maloney's reliance on Detective O'Callaghan's testimony at the suppression hearing (after Maloney found O'Callaghan not credible in the Chinatown case), established judicial bias. The court disagreed. Citing to the Seventh Circuit's *Schomig* opinion, the court found that Maloney's challenged rulings were merely "routine evidentiary ruling[s]."

Hooper now argues that the Illinois Appellate Court's decision violates both § 2254(d)(1) and § 2254(d)(2). In particular, he claims that (1) in ruling on his post-conviction petition, the court acted "contrary to" clearly established federal law when it held that he was not entitled to relief on this claim—a result the court reached by "requiring a showing of observable unfair conduct," looking exclusively to Maloney's on-the-record behavior, and deferring to the Illinois Supreme Court's review of Maloney's rulings (Am. Pet. at 65-69); (2) the court unreasonably applied clearly established federal law in failing to extend the principles set out in *Tumey v. Ohio*, 273 U.S. 510 (1927), to the facts of his case; and (3) the court made unreasonable determinations of fact in light of the evidence by finding that Maloney was not biased at the pre-trial hearing on the motion to suppress or at the *Batson* hearing.

Hooper's argument under § 2254(d)(1) is rooted in *Tumey*, in which the Court held that a defendant's due process rights are "certainly violate[d]" when he is tried by a judge who has "a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Tumey*, 273 U.S. at 523. From *Tumey*, which he calls "[t]he controlling rule," Hooper apparently argues that no proof of actual bias is required,[7] and the appellate court's reliance on the "actual bias" test described in *People v. Fair*, 738 N.E.2d 500 (Ill. 2000), is misplaced. (Am. Pet. at 61, 66.) Hooper instead would have the court look to the "uniquely strong evidence" that Maloney had an interest the

---

[7]     The court had to read the ninety-seven page amended petition—which lacks a table of contents and violates the court's Local Rule 5.2(c) by packing additional lines of text onto every page—numerous times in order to glean the precise nature of Hooper's arguments. The court also notes that the State contributes somewhat to the complexity of review. The record runs over 13,000 pages (Exhibits A through MMMM), and although a general index was provided, the court had difficulty locating the transcripts, pleadings, orders, and opinions that it needed to review; in fact, it had to work primarily from Hooper's "Clarification of Record Citations" in order to locate necessary items. Of course, the court recognizes the challenges posed by this thirty-year-old case, and greatly appreciates both parties' effort and assistance, but believes the issues warrant mention to avoid any further oversights.

outcome of Hooper's case: Maloney's need to avoid detection, because "[i]f Maloney's coverup failed, he stood to lose . . . liberty, reputation, financial assets, family and homes." (Am. Pet. at 47, 65-67.) Because this is not the relevant "clearly established" federal law, Hooper's § 2254(d)(1) claim must fail. *See Yarborough*, 541 U.S. at 660 ("We begin by determining the relevant clearly established law."); *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010) ("As a threshold matter, we must identify the 'clearly established Federal law' at issue."); *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008) ("[O]nly if we answer affirmatively the threshold question as to the existence of clearly established federal law, may we ask whether the state court decision is either contrary to or an unreasonable application of such law.").

Generally speaking, this area of law is not always as clear as Hooper would have the court believe. *Compare Railey v. Webb*, 540 F.3d 393, 400 (6th Cir. 2008) ("In only two types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process—(1) those cases in which the judge 'has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion,' (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, such as those in which the 'judge becomes personally embroiled with the contemnor.'") (citations omitted), *with Schomig*, 286 F.3d at 411 ("[O]rdinarily 'actual bias' is not required, the appearance of bias is sufficient to disqualify a judge."). And there is another, more significant roadblock in Hooper's way: although Maloney's bias is "not the stuff of typical judicial-disqualification disputes," *Gramley*, 520 U.S. at 904-05 (citations omitted), Hooper's case is not unique. In fact, the Supreme Court addressed nearly identical facts in *Gramley*, as that case involved Hooper's one-time codefendants.

There, the Court relied heavily upon the fact that Bracy supported his habeas discovery request "by pointing not only to Maloney's conviction for bribe taking in other cases, but also to additional evidence . . . that Maloney was actually biased *in petitioner's own case.*" *Id.* at 909 (further noting that difficulties of proof would likely arise, and Bracy might be "unable to obtain evidence sufficient to support a finding of *actual judicial bias* in the trial of his case") (emphasis in parenthetical added).

In light of *Gramley*—a decision addressing almost identical facts and resting in significant part upon Bracy's ability to establish actual bias—the appellate court did not act contrary to, or unreasonably apply, "clearly established" Supreme Court law by requiring Hooper to establish actual bias in his case. This conclusion is bolstered by the Seventh Circuit's later decision in *Schomig*. There, the Seventh Circuit interpreted *Gramley* as requiring a petitioner to show "actual bias," as opposed to the appearance of bias, *and* to connect the complained-of bias to his specific case. *Schomig*, 286 F.3d at 410. This is the same standard that the Illinois Appellate Court applied when it required Hooper to establish actual bias and a "nexus" between Maloney's criminal conduct elsewhere and in Hooper's own case. The Seventh Circuit does not dictate "clearly established" federal law under AEDPA—only the Supreme Court can do that. But at the very least, the fact that the Seventh Circuit interpreted *Gramley* to require a showing of actual bias supports this court's conclusion that the Illinois Appellate Court did not act contrary to, or unreasonably apply, "clearly established" Supreme Court law to these particular facts. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam) ("A federal court may not overrule a state court for simply holding a view different from its own,

when the precedent from this Court is, at best, ambiguous."). As a result, Hooper's claims under § 2254(d)(1) cannot succeed.

Hooper also argues that, under § 2254(d)(2), the Illinois Appellate Court made unreasonable determinations of fact by finding that Maloney was not biased at the pre-trial suppression hearing or at the *Batson* hearing. But the appellate court did something different: it applied the "actual bias" test described above and held that Hooper failed to make the requisite showing. The appellate court arrived at that result by analyzing Hooper's proffered evidence of bias—such as Maloney's decision to exclude evidence of the alleged discriminatory practices of the prosecutors at unrelated trials—before concluding that Hooper either had not established the requisite nexus, or that the proffered evidence was not evidence of bias at all.[8] These decisions were not objectively unreasonable.

Hooper attempts to paint the appellate court's decision as necessarily unreasonable by arguing that the appellate court deferred to the Illinois Supreme Court's 1989 opinion. Since the Illinois Supreme Court knew nothing of Maloney's corruption in 1989, Hooper argues that any deference is unreasonable. A full and fair reading of the appellate court's opinion, however, puts this concern to rest. In most instances, the appellate court did not even reference the Illinois Supreme Court's reasoning or holdings.

---

[8]     Hooper argues that the court demanded he point to "on-the-record rulings" to establish Maloney's bias. (*See* Am. Pet. at 69.) This is incorrect. The appellate court discussed Hooper's reliance on evidence such as Maloney's private letters and Maloney's *Batson* rulings in other, unrelated cases before concluding that Hooper failed to establish a "nexus" to his case. This does not mean that the court refused to look beyond "on-the-record rulings"—it only means that the court felt Hooper had failed to establish any relationship between that evidence and his own case.

Instead, it engaged in a fresh look at Hooper's proffered evidence.[9]  With regard to Maloney's determination that Hooper failed to make out a *prima facie* case of race discrimination in jury selection, the appellate court did note that the Illinois Supreme Court found Maloney's determination not to be against the manifest weight of the evidence, and the appellate court went on to state that "[i]n light of the supreme court's ruling, we conclude that Maloney's findings at the *Batson* hearing were proper and, therefore, are not evidence of his bias."  But this court does not read the statement to indicate some sort of deference to Maloney; instead, the statement reflects the fact that a particular ruling that falls within the range of discretion says little about whether that ruling was infected by compensatory bias.  *See Schomig*, 286 F.3d at 434 (Rovner, J., concurring in part and dissenting in part) ("Rulings that on their face are justifiable . . . tell us little about whether compensatory bias was at work in the judge's decision-making.").

The fact is that the appellate court was fully aware of Maloney's egregious behavior at the time of its review, and that court made an independent determination that Hooper failed to establish actual bias or a nexus between Maloney's corruption and his own case.[10]  Regardless of whether this court would reach that conclusion in the first

---

[9]     As one example, the appellate court analyzed Hooper's claim that one of the prosecutors challenged a large percentage of black jurors at the trial of Frank Teague.  The court stated that upon its own review of the transcripts, Hooper had not attempted to introduce this evidence at the *Batson* hearing, and that Hooper's claim that Maloney refused to admit this evidence was refuted by the record.

[10]     This distinguishes Hooper's case from that of his one-time codefendants.  The state courts never had the chance to evaluate what effect, if any, Maloney's corruption had on Collins and Bracy's trial, and the issue was raised for the first time in their habeas petitions to the federal district court in 1994.  *See U.S. ex rel. Collins*, 868 F. Supp. at 981.  Both for that reason and because AEDPA did not apply to their petitions (*see supra* note 3), the federal courts were not in a position to give the state-court adjudications extreme deference.  *See Matheney v. Anderson*, 377 F.3d 740, 746 (7th Cir. 2004) (describing AEDPA as "a statutory scheme that is extremely deferential to state-court adjudications").

instance, the court cannot say that the appellate court's decision was objectively unreasonable.

One final point: Hooper takes the appellate court to task, arguing that the court could not have evaluated the evidence of bias fully because it "devoted only three weeks to this case," thereby raising a "strong inference" that the court's review of the record "was far too superficial to warrant deference under Section 2254(d)." (Am. Pet. at 68, n.25.) But while Maloney is no longer entitled to the presumption that he properly discharged his official duties, *see Schomig*, 286 F.3d at 409, the appellate court unequivocally is entitled to such a presumption. Moreover, the record itself strongly supports the conclusion that the appellate court conducted a thorough review of Hooper's petition. *See, e.g.*, *supra* note 9 (discussing the appellate court's review of the *Batson* hearing transcripts).

## C. The *Batson* Claim

In his petition, Hooper recounts in detail the manner in which the prosecution exercised its peremptory strikes, resulting in the exclusion of all black veniremembers from the jury. Twice during the voir dire Hooper's counsel raised the issue with Maloney, and twice Maloney rejected Hooper's claims of prosecutorial discrimination. At the time, the State provided race-neutral explanations for peremptorily striking four of the five black veniremembers.

After the U.S. Supreme Court decided *Batson* and the Illinois Supreme Court remanded the case, Maloney held a *Batson* hearing. At the hearing, the State conceded that the prosecution had not provided any explanation for striking a black veniremember named Minnie Nelson. At the close of the hearing, Maloney found that (1) there were

fewer black potential jurors in the venire than typical for a venire of that size (about sixty members), (2) the State had exercised peremptory challenges against five black veniremembers and six white veniremembers, (3) the State had offered specific reasons for excluding four of the five black jurors, and (4) the State purported to strike the fifth juror not because she was black, but because she was female, in an attempt to "effect a better gender balance."[11] Maloney concluded that the pattern of strikes did not give rise to an inference of discriminatory intent.[12] Thus, he held that Hooper failed to make out a *prima facie* case of discrimination.

The Illinois Supreme Court scrutinized Maloney's ruling in great detail. The court began by correctly identifying the governing legal principles in *Batson*, including the facts and circumstances relevant to the question of whether a prosecutor has purposefully discriminated. *See Hooper*, 552 N.E.2d at 698-99 (noting that considerations relevant under *Batson* might include "[r]emoval of all black venirepersons" as well as "a pattern of excusing black jurors; the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges; the disproportionate use of peremptory challenges to blacks; the level of black representation in the venire as compared to the jury; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the race of the defendant and the

---

[11]    Although Maloney only reached "stage one" of the *Batson* inquiry, he made reference to the reasons provided by the State: "Neutral, valid and logical reasons were stated as predicates upon which the challenges were based." Maloney did not need to determine whether those reasons were pretextual until "stage three," but the Seventh Circuit has recognized that "courts considering *Batson* claims at the *prima facie* stage may consider apparent reasons for the challenges discernible on the record, regardless of whether those reasons were the actual reasons for the challenge" as part of the court's consideration of "all relevant circumstances." *See United States v. Stephens*, 421 F.3d 503, 515-16 (7th Cir. 2005) (citation omitted).

[12]    This was prior to the Supreme Court's decision in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994), when the Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality."

victim; and the race of the witnesses") (citations and internal quotation marks omitted). The court then went on to note that great deference was owed to Maloney, because Maloney made factual findings and observed first-hand the jury selection process.

The court expressly recognized that the prosecutor did not provide a reason for excusing one of the black prospective jurors, but did offer explanations for the four remaining black veniremembers. In analyzing the factors that Maloney considered, the court mentioned the fact that "an unusually small number of blacks were called to serve on the venire," that "the crime was not interracial in the sense that the defendant, the victims and the principal witnesses were black," that "the use of challenges to excuse blacks was not disproportionate in that slightly more whites were excused than blacks," and that "a prosecutor had peremptory challenges remaining but did not use them to strike a black venireperson," all of which weighed against a *prima facie* finding of discrimination. *Id.* at 701. In light of these considerations, the Illinois Supreme Court could not conclude that Maloney's finding was against the manifest weight of the evidence.

The court also addressed Hooper's claim that it should not defer to Maloney because (1) he did not conduct the hearing according to the requirements of *Batson*; (2) he manifested a bias against *Batson* and against Hooper; and (3) he acted as a prosecutor by giving reasons for the exercise of peremptory challenges. The court rejected all of these claims. First, it found Maloney was aware of the *Batson* requirements and carefully considered the arguments of the parties. Second, while Maloney expressed "unhappiness" with *Batson*, he never suggested he would not follow the law, and he specifically stated that he was waiting to make up his mind about the case. *Id.* at 703.

Finally, the court disregarded the last concern, finding instead that Maloney "had excellent recall as to the facts and circumstances of the *voir dire*."

Hooper raised the issue in his post-conviction petition, which was first addressed by Judge Fox. Relevant here, Hooper argued his *Batson* claim should reviewed *de novo* in light of Maloney's conviction and because Hooper had new evidence that Maloney was himself "unduly race-conscious." On the merits, Hooper argued that the State violated *Batson* by failing to provide any reason for exercising a peremptory challenge against one black veniremember, and that the reasons provided by the State for its other peremptory challenges were pretextual. Judge Fox concluded that there was no evidence Maloney's alleged bias affected the *Batson* hearing, and that in any event the issue was *res judicata* based on Hooper's direct appeal. Judge Fox also noted that the claim would fail anyhow, because he would not substitute his own judgment for that of the Illinois Supreme Court. On appeal, Hooper did not seek direct review of the prosecutors' preemptory challenges; instead, he focused upon Maloney's alleged bias during the *Batson* hearing. That issue was addressed above, in Section III(B)(2). In this section, then, the court analyzes the Illinois Supreme Court's decision to determine whether it runs afoul of § 2254(d). *See Davis v. Lambert*, 388 F.3d 1052, 1058 (7th Cir. 2004) ("'[W]e have repeatedly held that *res judicata* is not a bar to consideration of claims in a federal habeas action.'") (quoting *Moore v. Bryant*, 295 F.3d 771, 776 n. 1 (7th Cir. 2002)).

Hooper argues that the supreme court unreasonably determined the facts and unreasonably applied *Batson* when it concluded that Hooper failed to establish a *prima facie* case of intentional discrimination. In particular, under § 2254(d)(2) he claims that

the court unreasonably found that black veniremembers were not disproportionally struck; that Maloney relied in part on the fact that most of the witnesses were black; and that Maloney had "excellent recall" of the voir dire. Under § 2254(d)(1), he argues that the supreme court unreasonably applied *Batson* by discounting evidence that similarly situated black venirepersons were treated differently than their white counterparts; and by deferring to Maloney's erroneous findings that all five juror strikes were explained, even though no explanation was provided for one of those strikes.

The court begins by clearing away those arguments that have no merit. Even assuming *arguendo* the supreme court's statement that black veniremembers were not disproportionally struck can be characterized as a factual finding, the supreme court accurately stated precisely what it meant: "the use of challenges to excuse blacks was not disproportionate *in that* slightly more whites were excused than blacks." *Hooper*, 552 N.E.2d at 701 (emphasis added). The parties agree that five of the eleven strikes exercised by the prosecution were exercised against black veniremembers. Thus, Hooper has not established by clear and convincing evidence that this statement is erroneous.

With regard to the confusion surrounding whether all five strikes against black veniremembers were explained during voir dire, a review of the *Batson* hearing transcript illustrates that this problem may be more perceived than real. On numerous occasions during the hearing, Hooper pointed out—and the State agreed—that the State did not offer a reason for excusing the first black veniremember to be struck, Minnie Nelson. After Nelson, four black veniremembers were peremptorily challenged by the prosecutors. In order, those veniremembers were Hardiman Williams, Cynthia Miller, Willa Austin, and Jesse Thomas. The proffered reasons for Williams, Miller, and

Thomas were specific to each juror (for example, Thomas was purportedly struck because her brother had been convicted of a crime, raising questions of fairness), whereas the proffered reason for the "fourth" juror, Austin, was not related to Austin's own answers or behavior during voir dire. Instead, the prosecutor stated that the venire was composed almost entirely of women, and he sought to restore some gender balance by striking Austin.

At the *Batson* hearing, the parties and Maloney occasionally became tangled in their attempts to discuss the manner and order in which the various jurors were struck by reference to each juror's "number." For instance, at one point during the hearing, the State specifically referred to Nelson as the "fifth" juror, presumably because she was the only one for whom no explanation was offered. (*See Batson* Hr'g Tr. at 456, ECF No. 53-10 at 210.) In his brief opinion, Maloney stated that when Hooper's counsel made objections during voir dire,

> one of the prosecutors responded immediately and gave specific reasons for having excluded 4 of the 5 black jurors. With respect to the 5th black juror excused, a female, the state contended, on the trial record, that the defense was endeavoring, by the use of its challenges, to seat an all female jury, and that the state was endeavoring, late in the selection process, to effect a better gender balance of jurors.

Hooper read this as a finding that there were excuses provided for all five jurors. Hooper raised the issue in open court, and Maloney said that he thought perhaps reasons had been given for all of the jurors, but he did not have his notes, and in any event the fact that one juror went unexplained "would not change the Court's opinion [of] the tenor of the entire selection process." (*See id.* at 566, ECF No. 53-11 at 68.)

This court does not read Maloney's opinion to erroneously state that all five strikes were explained; instead, Maloney says that the prosecutor provided explanations

for four of the five jurors, and then provides more supporting detail and explanation with regard to the one juror that was not struck based on her personal characteristics: Austin. In this court's view, it is quite plausible that Maloney's reference to the "5th black juror" stems from lack of a clear method by which to refer to each juror. *See also Rice v. Collins*, 546 U.S. 333, 340 (2006) ("[I]t is quite plausible that the prosecutor simply misspoke with respect to a juror's numerical designation . . . . It is a tenuous inference to say that an accidental reference with respect to one juror, Juror 19, undermines the prosecutor's credibility with respect to Juror 16."). In any event, the supreme court—the relevant court here—expressly acknowledged that no explanation was given for one of the jurors, yet nonetheless determined that Maloney's ultimate conclusion was not against the manifest weight of the evidence. *Hooper*, 552 N.E.2d at 699. The court's conclusion that this arguable misstatement did not mandate a different outcome is not unreasonable. Regardless of whether Hooper characterizes this as an erroneous factual finding that Maloney had "excellent recall" under § 2254(d)(2), or as an unreasonable application of *Batson* under § 2254(d)(1), the claim fails.

Hooper also argues that the supreme court unreasonably applied *Batson* by discounting evidence that similarly situated jurors were treated differently. The supreme court expressly acknowledged Hooper's argument and took that argument seriously. *Hooper*, 552 N.E.2d at 701 ("[T]his argument cannot be lightly dismissed."). However, the court went on state that "[s]imply because a prosecutor rejects a black member of the venire and accepts a characteristically similar white member . . . it does not follow that this itself shows that the prosecutor's explanations were pretextual." *Id.* The court then deferred to Maloney, as he had considered all relevant circumstances in reaching his

ultimate conclusion as to Hooper's *prima facie* case. Regardless of whether this court would agree in the first instance, the supreme court's decision to do so was not unreasonable.

That leaves one issue: the supreme court's reliance on the fact that "[t]he trial judge also considered . . . that the crime was not interracial in the sense that the defendant, the victims and the principal witnesses were black." *Id.* According to the supreme court, the State offered up this rationale. *See id.* at 700 ("Finally, the State offers the point that there was no racial motivation for excluding black members of the venire because the case was one in which the defendant, the victim, and most of the witnesses were black."). The problem is that Maloney did no such thing. Hooper concedes that he is black and the victims were black, but he argues that the only evidence of record is that three of the prosecution's witnesses were white. (Am. Pet. at 36.) More to the point, not only is Maloney's written opinion silent on the issue of the witnesses' race, but this court scoured the *Batson* hearing transcript and there does not appear to be any statement or finding by Maloney on this issue.

The State characterizes the supreme court's statement as "careless," but unworthy of habeas relief. (*See* Ans. to Am. Pet. at 24 (citing *Henderson v. Briley*, 354 F.3d 907 (7th Cir. 2004).) *Henderson* does not help the State much, however, because in that case the Seventh Circuit addressed a case in an "unusual posture," where "[d]eficiencies in the trial court record led the Illinois Supreme Court to conduct its own review of the facts concerning the peremptory challenges exercised by the parties" and had to construct "an after-the-fact *Batson* process." *Henderson*, 354 F.3d at 910. In so doing, it made a comment about the use of comparative evidence at the *prima facie* stage. The Seventh

Circuit dismissed this careless comment, since the entire construct was "somewhat artificial" and the court had had to "fashion[ ] the entire framework for itself." *Id.* Here, by contrast, the supreme court arguably pointed to a clearly erroneous fact as direct support for its decision to defer to Maloney. If it did so, that would satisfy the standard set forth in § 2254(d)(2).

Not every factual mistake reflects an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The real question is whether the state court decision "*rests upon* a determination of fact that lies against the clear weight of the evidence." *Sternes*, 334 F.3d at 703-04 (emphasis added); *see Ben-Yisrayl*, 540 F.3d at 549 ("Because the [factual] finding falls directly within the Indiana Supreme Court's analysis of the prejudice element of the *Strickland*, the finding reflects an 'unreasonable determination of the facts in light of the evidence presented.'"). The state court decision does not have to depend solely upon that erroneous determination of fact; even partial reliance suffices. *See Ben-Yisrayl*, 540 F.3d at 550 ("The fact that the Indiana Supreme Court's decision only partially rested on this fact does not alter the reasonableness of the determination of the *Strickland* claim. . . . [E]ven a partial reliance on an erroneous fact finding can support a finding of unreasonableness.") (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)); *Dugas v. Coplan*, 428 F.3d 317, 333-34 (1st Cir. 2005); *U.S. ex rel. Puente v. Chandler*, No. 04 C 4877, 2010 WL 3167201, at *4 (N.D. Ill. Aug. 6, 2010).

This court must conclude that the supreme court relied, at least in part, on the fact that Maloney considered the race of the principal witnesses. On multiple occasions, the supreme court said that Maloney was obliged to consider "all relevant circumstances" in

evaluating Hooper's *prima facie* case, and it deferred to Maloney because it found that he had done so. *See Hooper*, 552 N.E.2d at 697-99. The supreme court also specifically called out the race of the witnesses as one of the relevant factors. *Id.* at 698 (citing *United States v. Mathews*, 803 F.2d 325, 332 (7th Cir. 1986), for the proposition that the race of the witnesses is a "relevant circumstance"). It went on to state that Maloney considered the fact that the principal witnesses were black, and cited its own *People v. Evans*, 530 N.E.2d 1360 (Ill. 1988), to support the proposition that "any racial question arising through the selection of the jury where the defendant is black, the victim is black and the majority of the witnesses are black is minimal, if not nonexistent." *Hooper*, 552 N.E.2d at 701. While this court cannot say that the race of the witnesses was the primary—or even a major—reason for the supreme court's decision, it is clear that the supreme court relied at least in part upon this belief. Thus, the supreme court unreasonably determined the facts in light of the evidence presented. *See Ben-Yisrayl*, 540 F.3d at 550.

Generally, once a petitioner establishes that the state court unreasonably determined the facts under § 2254(d)(2), he must go on to show that "that he is in custody in violation of the Constitution or laws or treaties of the United States" before he will be entitled to habeas relief. 28 U.S.C. § 2254(a); *see Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003) ("If the state court's opinion *was* unreasonable . . . then § 2254(d) no longer applies. A prisoner still must establish an entitlement to the relief he seeks, and it is § 2254(a), not § 2254(d), that sets the standard."). Where § 2254(a) applies, the habeas court engages in a *de novo* review of the constitutional issues. *See Berghuis v. Thompkins*, 130 S.Ct. 2250, 2265 (2010); *Gonzales v. Mize*, 565 F.3d 373, 384 (7th Cir.

2009) ("[E]ven if the Indiana Court of Appeals did not address Gonzales' specific argument, we would then apply *de novo* review under § 2254(a)."). But because this case involves a *Batson* challenge, it is not quite so simple. While this court does not defer to the Illinois Supreme Court's decision in light of that court's unreasonable determination of fact, it is Maloney who made the factual findings that actually undergird the *prima facie* analysis.

The federal circuit courts are not uniform in their manner of addressing *Batson* claims. In particular, the courts disagree as to whether the *prima facie* analysis presents a mixed question of law and fact, or a purely factual determination. *Compare Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004) (reviewing the trial court's *prima facie* determination as a factual finding that would have to be rebutted by clear and convincing evidence) *and Soria v. Johnson*, 207 F.3d 232, 238 (5th Cir. 2000) ("The state court's determination that Soria failed to make a *prima facie* showing is a factual finding.") *with Hardcastle v. Horn*, 368 F.3d 246, 254 (3d Cir. 2004) ("*Batson* claims constitute mixed questions of law and fact for purposes of federal habeas corpus review.") *and Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002) ("[T]he threshold decision concerning the existence of a *prima facie* case of discriminatory use of peremptory challenges involves both issues of fact and an issue of law.") (internal quotation marks and citation omitted). In the Seventh Circuit, the *prima facie* determination is treated as a mixed question of fact and law. *See United States v. Jordan*, 223 F.3d 676 (7th Cir. 2000). On direct appeal, such claims are reviewed *de novo*, *see id.*, although "deference is afforded fact findings in a *Batson* challenge." *Stephens*, 421 F.3d at 510-11.

In the habeas context, "mixed questions of law and fact translate to 'mixed constitutional questions (*i.e.*, application of constitutional law to fact).'"  *Overton*, 295 F.3d at 276 (quoting *Williams*, 529 U.S. at 400 (O'Connor, J., concurring)).  These mixed questions must be analyzed by reference to the standards set out in AEDPA.  *See Rice v. White*, 660 F.3d 242, 249-50 (6th Cir. 2011); *Overton*, 295 F.3d at 277; *Bell v. Jarvis*, 236 F.3d 149, 157 (4th Cir. 2000).  *But see Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999) (pre-*Williams*, stating that a mixed question of law and fact presented in a habeas petition is "review[ed] de novo but with a grant of deference to any *reasonable* state court decision").  In short, this court must defer not only to Maloney's factual findings at the *Batson* hearing, but also to his conclusion that Hooper did not make out a *prima facie* case of intentional discrimination.[13]

This court is uncomfortable with the idea of deferring to Maloney in any way.  After all, no less an authority than the U.S. Supreme Court has recognized that Maloney "was shown to be thoroughly steeped in corruption through his public trial and conviction," and that he is not entitled to any presumption that he properly discharged his official duties.  *Gramley*, 520 U.S. at 909.  On the other hand, this court has already concluded that under AEDPA, the Illinois Appellate Court's determination that Hooper

---

[13]    It is worth mentioning that in looking at the ultimate *Batson* determination, the Supreme Court has repeatedly emphasized the deference owed to the trial judge's conclusions, even where there is a later state appellate court opinion.  *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (presuming the trial court's factual findings regarding the State's race-neutral explanations "to be sound unless [the petitioner] rebuts the presumption of correctness by clear and convincing evidence"); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) ("Only after a [certificate of appealability] is granted will a reviewing court determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable."); *see also Braxton v. Gansheimer*, 561 F.3d 453, 462-63 (6th Cir. 2009) (looking to a state trial court's *Batson* determination, which was affirmed by the state appellate court, and holding that the district court failed to accord "great deference" to the state trial court's factual findings); *White v. Harrison*, No. 06-0080 DOC (FFM), 2009 WL 2365458, at *14 n.17 (C.D. Cal. July 28, 2009) ("Supreme Court precedent indicates that the federal court should look to and apply the relevant AEDPA standards to the state *trial* court's factual determination, even where there is an extant state appellate court opinion on the issue.") (citations and internal quotation marks omitted).

failed to establish Maloney's actual bias in Hooper's own case warrants deference. In light of that conclusion, this court reviews Maloney's decision as if it were any other judge's decision.

For the reasons set out above, the court has already concluded that Hooper has not established by clear and convincing evidence that there are any factual errors in Maloney's opinion. Nor has Hooper established that Maloney's decision was "contrary to" or "an unreasonable application" of clearly established federal law. This court must stay mindful of the fact that Maloney issued his decision on July 30, 1987, just a little over a year from the date of the *Batson* decision. *See Lockyer*, 538 U.S. at 71 ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."); *Greene v. Palakovich*, 606 F.3d 85, 99 (3rd Cir. 2010). At that time, *Batson* jurisprudence was in its infancy, and although the Supreme Court stated that a *prima facie* case could be made out "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose," *Batson*, 476 U.S. at 93-94, or by reference to "any other relevant circumstances," *id.* at 96, the Court did not provide much guidance as to what those relevant circumstances might be. The only two examples it provided were (1) a pattern of strikes against black jurors included in the particular venire, and (2) the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges. *Id.* at 97.

In other words, Maloney was not required to consider the race of witnesses. Moreover, his opinion shows that he did take into account a number of relevant circumstances: that (1) there were fewer black potential jurors in the venire than typical

for a sixty-person venire, (2) the State had exercised peremptory challenges against five black veniremembers and six white veniremembers, (3) the State had offered specific "neutral, valid and logical" reasons for excluding four of the five black jurors, and (4) the State purported to excuse the fifth juror not because she was black, but because she was female, in an attempt to "effect a better gender balance." Maloney also listened to extensive argument—the *Batson* hearing took place over multiple days—and examined the transcript of the jury selection. Regardless of what this court would conclude were it deciding the issue in the first instance, it cannot say that Maloney's decision is "contrary to" or "an unreasonable application" of the law of the Supreme Court. This claim must also fail.

### D. The Police Coercion Claim

Finally, Hooper argues that his due process rights were violated by the use of his involuntary, coerced statements at trial. The facts surrounding these claims were detailed in the Background section. Briefly, Hooper claims that police officers, including Officers O'Callaghan, Hoke, and Oravetz, beat him; that the officers questioned him with a shotgun to his head; and that the officers injured his right leg but refused to provide medical attention. According to Hooper, the officers also threatened his family if he did not cooperate, and O'Callaghan told him what to say in his statement to the Assistant State's Attorney. Just before Hooper's trial, Maloney held a hearing regarding on Hooper's motion to suppress any oral or written communications he had made prior to his arrest. Hooper's counsel alleged violations of Hooper's Fourth, Fifth and Sixth Amendment rights, and claimed that these statements were the result of physical, mental, and emotional coercion. Maloney heard testimony, and ultimately denied the motion.

Hooper raised the coercion issue on direct appeal to the Illinois Supreme Court. The court agreed that "[t]he voluntariness of a confession depends upon whether it has been made freely, voluntarily and without compulsion or whether the accused's will was overborne at the time he confessed." *Hooper*, 552 N.E.2d at 694-95. The court then stated that a confession obtained by use of force or brutality would "[c]ertainly" be inadmissible, and went on to note that when a defendant clearly established that he received injuries while in police custody, the burden is on the State to establish—by clear and convincing evidence—the cause of that injury. The Illinois Supreme Court found that Hooper failed to show that he received injuries while in police custody, because (1) the blows to the head he claimed to have suffered were not visible in any photographs; (2) his appearance was not disheveled, as he might have appeared if he had been thrown to the ground; and (3) according to the testimony at trial, his infected cut could have been received up to five days before he was arrested, and there was confusion regarding whether the cut was the same wound he later displayed to the jury. The court concluded that Maloney did not abuse his discretion in denying Hooper's motion.

Hooper then sought to overturn this determination on collateral review. The State argued that the claim was barred by the doctrine of *res judicata*, but Hooper argued that in light of Maloney's alleged compensatory bias, the "fundamental fairness" exception required the post-conviction trial court to take another look at the issue. That exception provides that "the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence." *People v. Patterson*, 735 N.E.2d 616, 642 (Ill. 2000). To trigger the exception, the new evidence must be "of such conclusive character that it will probably change the result upon retrial"; it "must be material and not merely cumulative,"

and "it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence." *Id.* (internal quotation marks and citations omitted). Judge Fox declined to apply the exception, and applied *res judicata* to bar review of the claim.

On appeal, the Illinois Appellate Court was asked to consider newly discovered evidence that Hooper claimed would establish he had been beaten by police officers into confessing. Hooper argued that during proceedings in Arizona, Officer O'Callaghan and one of the prosecutors on his case, Assistant State's Attorney Owen, had given inconsistent recountings of how Hooper injured his leg. He also pointed to other arrestees' claims to have been tortured in Area 2 by police officers under the command of Jon Burge, and argued that those allegations supported his claim, both because Officer Hoke was a "buddy" of Burge's and because some of the acts Hooper described (like the use of the gun) were similar to those described by other arrestees. Again, the Illinois Appellate Court was asked to relax the *res judicata* standard, and again the court evaluated that request pursuant to the "fundamental fairness" exception. After evaluating Hooper's evidence, the appellate court held that the exception did not apply. With regard to the other arrestees' allegations, the court found those allegations either too dissimilar or remote in time to be relevant. As to the shifting tales of O'Callaghan and Owen, Hooper had neglected to show how that evidence would have changed the result of his trial, and so he had forfeited that part of his claim.

Hooper now argues that this court should review his coercion claim *de novo* because the Illinois Supreme Court decided the claim based on state-law grounds that contradict clearly established federal law. Moreover, Hooper states even if the federal

issue *was* addressed by the Illinois Supreme Court, that court acted contrary to clearly established federal law and unreasonably applied the law by focusing on evidence of physical injury to the exclusion of all other factors.

The Illinois Supreme Court did not rest its decision on state-law grounds that contradict clearly established federal law. Hooper's view is that the supreme court looked only to the existence of visible injuries in lieu of the "totality of all the surrounding circumstances" test for voluntariness. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Had the court in fact relied upon a "visible injury" test, this court would have no trouble concluding that the decision was contrary to clearly established law.

That is not what the Illinois Supreme Court did. The court began by setting out the relevant legal standard: "The voluntariness of a confession depends upon whether it has been made freely, voluntarily and without compulsion or whether the accused's will was overborne at the time he confessed." *Hooper*, 552 N.E.2d at 496. Notably, for support the court cited its own *People v. Kincaid*, 429 N.E.2d 508, 512 (Ill. 1981), where it discussed in great detail governing legal principles and relevant caselaw from the U.S. Supreme Court. Citing *People v. Wilson*, 506 N.E.2d 571, 575-76 (Ill. 1987), the *Hooper* court went on to describe a quirk of Illinois law that actually works in defendants' favor: "where it is 'conceded or clearly established' that the defendant received injuries while in police custody, the burden is on the State to establish by clear and convincing evidence the cause of the defendant's injury." *Hooper*, 552 N.E.2d at 496-97. Hooper was unable to establish that he had received his injuries while in custody, and so the supreme court concluded that Maloney did not abuse his discretion in denying the motion to suppress.

In other words, the *Hooper* court was not looking exclusively to physical injuries to determine whether Hooper's confession was voluntary. Instead, the court recognized that under state law Hooper would have been entitled to place the burden on the State to prove the source of his injury *if* he could have established that he received the injury while in state custody. Because he could not establish that his injuries were sustained in state custody, he did not get to shift the burden. That did not mean, however, that the "totality of all the surrounding circumstances" suddenly became irrelevant; instead, it just meant that Maloney's determination of those surrounding circumstances would stand.

That this is merely a favorable state-law gloss and not some alternative rule restricting a court's evaluation of the voluntariness of a confession is highlighted by a review of *Wilson*. There, the Illinois Supreme Court recognized that in many cases, the question of coercion comes down to a question of credibility: "Where the only evidence of coercion is the defendant's own testimony, and where this is contradicted by witnesses for the People, then of course the trial court may choose to believe the latter, and our recognition of the superior position of the trial court to evaluate the credibility of the witnesses before it makes us reluctant to reverse its determination." *Wilson*, 506 N.E.2d at 575. But the reviewing court overcomes that reluctance in a situation where the defendant clearly received his injuries while in state custody, and the only issue is "how and why" those injuries were inflicted: "Under such circumstances the burden of establishing that the injuries were not administered in order to obtain the confession, can be met only by clear and convincing testimony as to the manner of their occurrence." *Id.*

In sum, while the Illinois Supreme Court's review Hooper's coercion claim was succinct, the court did not act contrary to, or unreasonably apply, clearly applicable

federal law in determining that Maloney did not abuse his discretion in denying the motion to suppress.

**E. Revisiting the Motion Requesting Evidentiary Development**

In Section III(A), this court concluded that in light of *Cullen*, Hooper would have to overcome the limitations of § 2254(d) based on the state-court record, and that only if he satisfied the AEDPA prerequisites would he arguably be entitled to discovery, expansion of the record, or an evidentiary hearing. Because this court has concluded that Hooper's coercion claim was resolved on the merits based on relevant federal law, and because none of Hooper's claims satisfy either § 2254(d)(1) or (d)(2), the court does not grant Hooper's request.

**F. Certificate of Appealability**

Hooper has requested that this court issue a certificate of appealability "on all issues." (*See* Reply to Ans. to Am. Pet. at 17 n.8.) The request is governed by 28 U.S.C. § 2253(c)(2), and requires a "substantial showing of the denial of a constitutional right." "An applicant has made a 'substantial showing' where 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The bottom line here is that a black defendant was tried by a corrupt judge in front of an all-white jury and sentenced to death. Moreover, the interplay between the "actual bias" requirement and the highly deferential standards set out in AEDPA place this case into a class by itself. Difficult issues have arisen at every step along the way, and the court has no doubt that reasonable

jurists could debate the outcome—particularly where Maloney is concerned. *See Schomig*, 286 F.3d at 411 ("[T]he nature and extent of Maloney's dereliction of duty casts this case in an unusual light and makes it hard to put Maloney in any normal framework."). Hooper has made a substantial showing of the denial of a constitutional right as to all three of his claims, and the court grants a certificate of appealability as to the entire petition.

## IV. CONCLUSION

For the reasons set forth above, Hooper's request for an evidentiary hearing, expansion of the record, and discovery is denied; his petition for a writ of habeas corpus is denied; and his request for a certificate of appealability is granted.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   April 12, 2012